[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13731

_____

D.C. Docket Nos. 8:14-bk-09521-MGW; 8:14-cv-02816-JSM


In Re:  BAYOU SHORES SNF, LLC,

                                        Debtor.


_____


FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION,
UNITED STATES OF AMERICA, on behalf of the Secretary of the
United States Department of Health and Human Services,

                                        Plaintiffs - Appellees,

versus

BAYOU SHORES SNF, LLC,

                                        Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 11, 2016)

Before HULL, JULIE CARNES, and CLEVENGER,[*] Circuit Judges.

CLEVENGER, Circuit Judge:

Bayou Shores SNF, LLC ("Bayou Shores") operates a skilled nursing facility in St. Petersburg, Florida.  Most of Bayou Shores' patients are on Medicare or Medicaid, and over ninety percent of its revenue is derived from Medicare and Medicaid patients.  It receives compensation for Medicare and Medicaid services through provider agreements entered into with the federal and state governments. Bayou Shores' entitlement to participate in the provider agreements depends on its continued compliance with qualification requirements for such facilities that are established by the Secretary of the Department of Health and Human Services. After an unchallenged exercise of her statutory oversight authority, the Secretary determined that Bayou Shores was not in substantial compliance with the Medicare program participation requirements, and that conditions in its facility constituted an immediate jeopardy to residents' health and safety.  By letter dated July 22, 2014, the Secretary notified Bayou Shores that its Medicare provider agreement "will be terminated at 11:59 pm on August 3, 2014."  The termination of Bayou Shores' Medicare provider agreement triggered the termination of its Medicaid provider agreement as well.

---

[*] Honorable Raymond C. Clevenger, III, United States Circuit Judge for the Federal Circuit, sitting by designation.

To avoid the consequences of termination of its provider agreements, Bayou Shores sought protection in the United States Bankruptcy Court for the Middle District of Florida. Rejecting the jurisdictional challenge from the Secretary, the bankruptcy court assumed authority over the Medicare and Medicaid provider agreements as part of the debtor's estate, enjoined the Secretary from terminating the provider agreements, determined for itself that Bayou Shores was qualified to participate in the provider agreements, required the Secretary to maintain the stream of monetary benefit under the agreements, reorganized the debtor's estate, and finally issued its Confirmation Order on December 31, 2014.

On appeal, in a June 26, 2015, Order, the United States District Court for the Middle District of Florida upheld the Secretary's jurisdictional challenge and reversed the Confirmation Order with respect to the assumption of the debtor's Medicare and Medicaid provider agreements. *See In re Bayou Shores SNF, LLC*, 533 B.R. 337, 343 (M.D. Fla. 2015).

Bayou Shores timely appeals the decision of the district court. The appeal turns on the jurisdictional question. From the Social Security Amendments of 1939 until 1984, it is undisputed that bankruptcy courts lacked jurisdiction over Medicare claims. The statute barring such jurisdiction was finally recodified in 1984 to reflect an earlier recodification of the Judicial Code. In cases involving the interpretation of statutory language changed in a recodification, it has long been

3

established that no change in the previous recodified law is recognized unless Congress's intention to make a substantive change is "clearly expressed." *United States v. Ryder*, 110 U.S. 729, 740 (1884).  Now the central question is whether the statutory revision in this case demonstrated Congress's clear intention to vest the bankruptcy courts with jurisdiction over Medicare claims.  We think it is abundantly clear that Congress expressed no such intention.

Therefore, after careful review of the record and the parties' briefs, and with the benefit of oral argument, and for the reasons set forth below, we affirm the district court's Order.

I.      BACKGROUND

The relevant facts of this case are generally undisputed and ably set out by the district court in the opinion below. *See In re Bayou Shores SNF, LLC*, 533 B.R. 337, 338-40 (M.D. Fla. 2015).  A brief summary follows.

A.      Bayou Shores' "Skilled Nursing Facility"

As noted above, Bayou Shores operates a "skilled nursing facility"[1] in St. Petersburg, Florida, and approximately ninety percent of Bayou Shores' revenue is derived from caring for Medicare and Medicaid patients.  To be eligible for the Medicare/Medicaid program, Bayou Shores entered into so-called "provider agreements" with the federal and Florida state governments, respectively, which

---

[1] A "skilled nursing facility" is statutorily defined at 42 U.S.C. § 1395i-3(a).

provide reimbursement to Bayou Shores for the provision of medical services to Bayou Shores' Medicare/Medicaid patients.  As a condition of payment under these agreements Bayou Shores must comply with certain regulatory requirements pertaining to skilled nursing facilities.[2]  The Plaintiffs in this case are the government agencies primarily tasked with monitoring Bayou Shores' compliance with these regulations: the Florida Agency for Health Care Administration ("AHCA") and the United States Department of Health and Human Services ("HHS") (collectively, "the Government").  AHCA is responsible for conducting surveys of skilled nursing facilities in Florida and administering the state's Medicaid program.  HHS administers Medicare nationally, and uses AHCA's surveys to decide whether skilled nursing facilities in Florida are compliant with the regulations, and if not, what remedial action to take.  When conditions at a skilled nursing facility pose immediate jeopardy to the health or safety of the facility's patients, the law requires the Secretary to select and execute an appropriate remedy.[3]

---

[2] *See e.g.* 42 C.F.R. Part 483, Subsection B.

[3] The Secretary of HHS's duty to take remedial action in the face of immediate jeopardy to a facility's patients is explained in 42 U.S.C. § 1395i-3(h)(2), where Congress specified that the Secretary "shall" take remedial action in response to immediate jeopardy. *See* 42 U.S.C. § 1395i-3(h)(2)(A)-(B) (statutorily defined remedies include termination from program, denial of payments, civil monetary penalties, and appointment of temporary management); *see also id.* at (f)(1) ("It is the duty and responsibility of the Secretary to assure that requirements which govern the provision of care in skilled nursing facilities under this subchapter, and the enforcement of such requirements, are adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys.").

On February 10, 2014, AHCA conducted such a survey at Bayou Shores'

skilled nursing facility.  As a result of the survey, AHCA reported to HHS that

Bayou Shores was not compliant with the relevant regulations.  The survey noted a

number of problems including failing to correctly track residents' "Do Not

Resuscitate" orders, poor patient hygiene, and unsecured expired medications.

AHCA determined that at least some of these deficiencies posed a threat of

immediate jeopardy to Bayou Shores' patients.[4]  Bayou Shores was given an

opportunity to remedy these deficiencies.  In a follow-up survey on March 20,

2014, AHCA again found a number of deficiencies. These included Bayou Shores

placing a "known sexual offender" in a room with a disabled patient without

informing that patient, and subsequently failing to appropriately handle an alleged

sexual assault by the "known sexual offender" reported by the disabled patient. As

with the previous survey, AHCA found that at least some of these deficiencies

posed a threat of immediate jeopardy to Bayou Shores' patients.  Bayou Shores

was again given the opportunity to remedy the deficiencies.

The proverbial "last straw" was a final survey on July 11, 2014, in which

further deficiencies were identified, including allowing a mentally impaired

---

[4]  Immediate jeopardy exists if the nursing home's noncompliance has caused or is likely to cause "serious injury, harm, impairment or death to a resident." 42 C.F.R. § 488.301. The regulation only requires that the nursing home's noncompliance is likely to cause harm to "a resident." Though correctly quoting the regulation, the bankruptcy court appears to have incorrectly believed that actual harm is required for a finding of "immediate jeopardy."  *See In re Bayou Shores SNF, LLC*, 525 B.R. 160, 163 (Bankr. M.D. Fla. 2014).  However, actual harm is not a prerequisite for a finding of immediate jeopardy.

resident to leave the facility unaccompanied on a hot Florida day (he was later found at a bus station). AHCA again determined that at least some of these deficiencies placed Bayou Shores' residents in immediate jeopardy. After the third finding of non-compliance, HHS sent Bayou Shores a letter on July 22, 2014 notifying Bayou Shores that its non-compliance posed an "immediate jeopardy to [Bayou Shores'] residents' health and safety," and that HHS was exercising its regulatory discretion to terminate Bayou Shores' Medicare provider agreement. HHS's letter stated that the "Medicare provider agreement will be terminated at 11:59 pm on August 3, 2014."[5] The termination of Bayou Shores' Medicare provider agreement triggered the termination of Bayou Shores' Medicaid provider agreement.[6]

B.    Bankruptcy Court Proceedings

Two days before this looming deadline, on August 1, 2014, Bayou Shores sought emergency injunctive relief from the U.S. District Court for the Middle

---

[5] The statute permits HHS to terminate a provider agreement in light of a finding of immediate jeopardy without a pre-termination hearing for the provider.  *See* 42 U.S.C. § 1395i-3(h)(2)(a); *see also Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 366 (6th Cir. 2000) (no pre-termination hearing required under Due Process Clause); *Northlake Cmty. Hosp. v. United States*, 654 F.2d 1234, 1241-43 (7th Cir. 1981) (same).

[6] Though Bayou Shores disputes whether Florida has followed the correct procedure to "finalize" the termination of their Medi*caid* provider agreement, Bayou Shores does not appear to dispute that such termination will be the end result of the termination of the Medi*care* provider agreement. *See e.g.* 42 U.S.C. § 1396a(a)(39); Fla. Stat. § 409.913(14); *see also Livingston Care Ctr., Inc. v. United States*, 934 F.2d 719, 720 (6th Cir. 1991) ("The Secretary of Health and Human Services's termination of the plaintiffs' Medicare certification automatically triggered termination of plaintiffs' Medicaid certification as well").

7

District of Florida to prevent the termination of the provider agreements. The

district court initially granted Bayou Shores' request for a temporary restraining

order. However, on motion of HHS, the district court dismissed Bayou Shores'

complaint for lack of subject matter jurisdiction. On August 15, 2014, the court

found that Bayou Shores had not exhausted its administrative remedies, and thus

Medicare's jurisdictional bar (42 U.S.C. § 405(h)) prevented the district court from

exercising jurisdiction over the termination of the provider agreements. *See Bayou*

*Shores SNF, LLC v. Burwell*, No. 8:14-CV-1849-T-33MAP, 2014 WL

4059900,*6-8 (M.D. Fla. Aug. 15, 2014). Approximately an hour after issuance of

the district court's order, Bayou Shores filed a Voluntary Petition for Chapter 11

bankruptcy, and sought an emergency injunction from the bankruptcy court

preventing HHS and AHCA from terminating the provider agreements. The

Government, at each opportunity, challenged the bankruptcy court's jurisdiction to

order assumption of the provider agreements.

On August 25, 2014, the bankruptcy court issued the preliminary injunction

sought by Bayou Shores. The bankruptcy court reasoned that it had jurisdiction

pursuant to 28 U.S.C. § 1334,[7] the provider agreements were property of the estate,

and an automatic stay preventing HHS and AHCA from terminating the

agreements was thus proper. At a subsequent evidentiary hearing on August 26,

---

[7] 28 U.S.C. § 1334, titled "Bankruptcy cases and proceedings," generally defines the original and exclusive jurisdiction of district courts over bankruptcy proceedings.

the bankruptcy court heard testimony from doctors, patients, and other Bayou Shores witnesses. Concluding that in its view Bayou Shores' patients did not appear to be in any immediate jeopardy, the bankruptcy court issued an order on September 5, 2014 that (among other things) forbade HHS and AHCA from terminating Bayou Shores' provider agreements.

After further proceedings, on December 31, 2014 the bankruptcy court issued its Confirmation Order. *See In re Bayou Shores SNF, LLC*, 525 B.R. 160 (Bankr. M.D. Fla. 2014). In the Confirmation Order, the bankruptcy court again stated its belief that jurisdiction was proper under 28 U.S.C § 1334, and rejected HHS and AHCA's argument that the same 42 U.S.C. § 405(h) bar applied to the bankruptcy court as applied to the district court. The bankruptcy court reasoned that the plain language of § 405(h), which refers only to 28 U.S.C §§ 1331 and 1346, did not prevent the bankruptcy court from exercising jurisdiction over the assumption of the provider agreements under § 1334. *Id.* at 166. The bankruptcy court further concluded that because Bayou Shores appeared to have remedied the deficiencies it was originally cited for, Bayou Shores had provided adequate assurances of future performance under the provider agreements, and thus was eligible to assume them. Finding the remainder of the statutory requirements fulfilled, the bankruptcy court confirmed Bayou Shore's Chapter 11 plan. The

9

bankruptcy court also ordered the dissolution of the automatic stay and preliminary injunction.[8]

## C.    District Court Proceedings

HHS and AHCA separately appealed both the bankruptcy court's September 5, 2014 Order, and the Confirmation Order.  The appeals were consolidated by the district court.  As they had argued to the bankruptcy court, HHS and AHCA asserted to the district court that 42 U.S.C. § 405(h) denied the bankruptcy court jurisdiction over the provider agreements.  The district court agreed.  While acknowledging that the bankruptcy court's reading of § 405(h) was an issue that the Eleventh Circuit had not squarely addressed, the district court noted that the majority of other circuit courts addressing the issue "have examined Congress' intent when it enacted the jurisdictional bar and concluded that the omission of section 1334 and other jurisdictional grants (like section 1332) was inconsistent with that intent." *In re Bayou Shores*, 533 B.R. at 342.  The district court reviewed the relevant statutory language and legislative history, as well as decisions from other courts examining the same.  In particular, the district court noted that the absence of § 1334 in the recodified 42 U.S.C. § 405(h) appeared to be the result of a codification error.  Based on that analysis, the district court held that it

---

[8] *See* Bankr. ECF No. 285 at 12-13 (ordering that "all injunctions and stays previously provided for in this case pursuant to sections 105 and/or 362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date.").  As explained further *infra*, the parties dispute what effect this dissolution has on the issues in this case.

10

"respectfully disagree[d] [with the bankruptcy court] and align[ed] itself with the majority view" in finding that § 405(h) must be understood to bar jurisdiction under § 1334. *Id.* at 343.

Because it was undisputed that Bayou Shores had yet to exhaust its administrative remedies, and "no other independent basis for jurisdiction existed to enjoin and order the assumption of the Medicare and Medicaid provider agreements," the district court reversed the orders of the bankruptcy court (with respect to the provider agreements). *Id.*

The district court also noted that a hotly contested issue on appeal was "the exact timing of any termination of the provider agreements." *Id.* However, the district court found that it did not need to resolve that issue, because the timing was irrelevant to whether or not the bankruptcy court lacked jurisdiction to hear the case in the first place. *Id.*[9]

Bayou Shores timely appealed the district court's order.

## II.    STANDARD OF REVIEW

In a bankruptcy case, this Court sits as a second court of review and thus examines independently the factual and legal determinations of the bankruptcy court and employs the same standards of review as the district court. *See Brown v.*

---

[9] The Government argues that the provider agreements terminated prior to Bayou Shores filing their bankruptcy petition, thus depriving the bankruptcy court of jurisdiction over the provider agreements. Bayou Shores (for various reasons) contests that argument. For reasons we explain below, we do not find it necessary to resolve this dispute.

11

*Gore (In re Brown)*, 742 F.3d 1309, 1315 (11th Cir. 2014).  We review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. *Id.*  The district court's legal determinations are also reviewed de novo. *See Dionne v. Simmons (In re Simmons)*, 200 F.3d 738, 741 (11th Cir. 2000).

III.    BANKRUPTCY COURT JURISDICTION OVER MEDICARE CLAIMS

The primary dispute in this case is purely legal: does 42 U.S.C. § 405(h) bar a bankruptcy court from exercising 28 U.S.C. § 1334 jurisdiction over claims that arise under the Medicare Act?  Bayou Shores' primary argument is that the plain text of § 405(h) precludes district court jurisdiction under 28 U.S.C. §§ 1331 and 1346 only. The Government argues that the lack of a reference to § 1334 is merely a result of a codification error, and that properly construed the statute requires exhaustion of administrative remedies before bringing a Medicare claim before any district court.

Because we conclude that the lack of a reference to § 1334 in § 405(h) is the result of a codification error, we agree with the Government that the bankruptcy court lacked jurisdiction over the termination of the provider agreements.  To see why, we turn first to an examination of the history of § 405(h).

A.    Legislative history of § 405(h)

The relevant text of the 42 U.S.C. § 405(h) currently reads (emphasis added):

12

(h) Finality of Commissioner's decision

The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought *under section 1331 or 1346 of Title 28* to recover on any claim arising under this subchapter.[10]

Bayou Shores argues that the third sentence of § 405(h) forbids only an "action" brought under "section 1331 [*i.e.* federal question jurisdiction] or 1346 [*i.e.* suits against the federal government] of Title 28."  Because Bayou Shores' action was brought under section 1334 of Title 28 (*i.e.* bankruptcy jurisdiction), Bayou Shores argues that § 405(h) does not apply.  To understand why Bayou Shores is incorrect however requires a thorough examination of the history of § 405(h), which reveals that the issue is not as straightforward as Bayou Shores suggests.

The original text of § 405(h) when passed in 1939 was largely the same as it is today, with the crucial difference for this case emphasized below:

(h) The findings and decision of the Board after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Board shall be reviewed by any

---

[10] § 405(h) applies to Medicare via 42 U.S.C. § 1395ii, which states that "any reference therein to the Commissioner of Social Security or the Social Security Administration shall be considered a reference to the Secretary or the Department of Health and Human Services, respectively."

person, tribunal, or governmental agency except as herein provided. No action against the United States, the Board, or any officer or employee thereof shall be brought under *section 24 of the Judicial Code of the United States* to recover on any claim arising under this title.

*See* Social Security Amendments of 1939, Pub. L. No. 76-379, 53 Stat. 1360 (1939) (emphasis added).  In 1939, "section 24 of the Judicial Code" defined the original jurisdiction granted to district courts, including jurisdiction over bankruptcy claims (*see* Judicial Code, Pub. L. No. 61-475, 36 Stat. 1087, § 24(19) (1911)), diversity and federal question claims (*id.* at § 24(1)), and claims against the United States (*id.* at § 24(20)).  With few exceptions then, section 24 of the Judicial Code originally "contained all of that title's grants of jurisdiction to United States district courts, save for several special-purpose jurisdictional grants of no relevance to the constitutionality of [Medicare] statutes."  *See Weinberger v. Salfi*, 422 U.S. 749, 756, n. 3 (1975).  It is thus undisputed that under the original text of § 405(h), bankruptcy court jurisdiction over Medicare claims was barred.

In 1948, however, Congress recodified section 24 of the Judicial Code under title 28 of the U.S. Code.[11]  As part of that revision, Congress split the district

---

[11] Codification refers generally to the process of arranging and organizing the Statutes at Large into the U.S. Code.  *See generally* Proceedings of the Fifty-First Annual Meeting of the American Association of Law Libraries, Fifth General Session, 51 Law Libr. J. 388 (1958) (remarks of Dr. Charles Zinn, Law Revision Counsel, explaining the process of codification); *see also* William W. Barron, *The Judicial Code*, 8 F.R.D. 439 (1949) (the "Chief Reviser, Title 28, U.S. Code, Judiciary and Judicial Procedure, and Title 18, U.S. Code, Crime and Criminal Procedure" explaining generally the 1948 Judicial Code revisions).

courts' jurisdictional grants into multiple sections under Title 28. *See* U.S. Code, Title 28, Pub. L. No. 80-773, 62 Stat. 869 (1948).  Among other things, federal question jurisdiction was re-codified to 28 U.S.C. § 1331, diversity jurisdiction to § 1332, suits against the government to § 1346, and bankruptcy jurisdiction to § 1334. *See id.* at Ch. 85, §§ 1331-1359 ("District Courts; Jurisdiction").

After the 1948 re-codification however, the text of § 405(h) continued to incorrectly refer to "section 24 of the Judicial Code" for approximately the next thirty years.  Indeed, the Supreme Court noted this issue in its 1975 *Salfi* decision. The text in the body of the Court's opinion replaced the reference in § 405(h) to "section 24 of the Judicial Code" with "[§ 1331 et seq.] of Title 28." *See Salfi*, 422 U.S. at 756.  A footnote in the opinion acknowledged the apparent error created by the 1948 Judicial Code recodification. *See id.* at n. 3.

By 1976 (after the *Weinberger* decision), the Office of the Law Revision Counsel appears to have recognized the error.[12]  In the edition of the U.S. Code published that year, the revisers substituted the phrase "section 24 of the Judicial Code of the United States" in  § 405(h)  with the now current language, "sections 1331 or 1346 of title 28."  A "Codification" note included in the 1976 revision indicates the following about the change:

---

[12] The Office of the Law Revision Counsel, created in 1974, is a body within the U.S. House of Representatives whose principal purpose is to codify the laws of the U.S. and periodically publish updates to the U.S. Code.  *See* 2 U.S.C. §§ 285 *et. seq.*

15

> In subsec. (h), "sections 1331 or 1346 of title 28" was substituted for "section 24 of the Judicial Code of the United States" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, section 1 of which enacted Title 28, Judiciary and Judicial Procedure. Prior to the enactment of Title 28, section 24 of the Judicial Code was classified to section 41 of Title 28.

*See* 42 U.S.C. § 405 (1976). The revisers expanded somewhat on this note in the

1982 version of the code (added text emphasized):

> In subsec. (h), "sections 1331 or 1346 of title 28" was substituted for "section 24 of the Judicial Code of the United States" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, section 1 of which enacted Title 28, Judiciary and Judicial Procedure. Prior to the enactment of Title 28, section 24 of the Judicial Code was classified to section 41 of Title 28. *Jurisdictional provisions previously covered by section 41 of Title 28 are covered by sections 1331 to 1348, 1350 to 1357, 1359, 1397, 1399, 2361, 2401, and 2402 of Title 28.*

*See* 42 U.S.C. § 405 (1982).

A year later, H.R. 3805, the "Technical Corrections Act of 1983" was

introduced to the floor of the House. 129 Cong. Rec. 23,439 (1983) (statement of

Rep. Rostenkowski). A report on the bill describes its derivation and purpose as

follows:

> The technical amendments made by the Technical Corrections Act of 1983 are intended to clarify and conform various provisions adopted by the acts listed above. The bill is based on a review by the staffs of the Joint Committee on Taxation and the Committee on Ways and Means, taking into account the comments submitted to the Congress that concerned changes that would be technical in nature. The bill was developed with the assistance of the Treasury Department, the Social Security Administration, and the Health Care Financing Administration.

*See* STAFF OF J. COMM. ON TAXATION, 98TH CONG., DESCRIPTION OF H.R. 3805 (TECHNICAL CORRECTIONS ACT OF 1983), at 1 (J. Comm. Print 1983) ("H.R. 3805 Rept.").

Among the numerous "technical amendments" was an amendment to § 405(h), proposing to enact the prior codification into positive law:

> (D) Section 205(h) of such Act is amended by striking out "Section 24 of the Judicial Code of the United States" and inserting in lieu thereof "section 1331 or 1346 of title 28, United States Code,".

*See Technical Corrections Act of 1983: Hearing on H.R. 3805 Before the H. Comm. on Ways and Means*, 98th Cong. 79 (1984) (draft text of H.R. 3805).[13] That section of the act, titled "Sec. 403. Other Technical Corrections in [old age, survivors, and disability insurance] Provisions,"[14] was followed by this in "Sec. 404. Effective Dates":

> (b)(1) Except to the extent otherwise specifically provided in this title, the amendments made by section 403 shall be effective on the date of enactment of this Act; *but none of such amendments shall be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date*.

---

[13] The U.S. Code is not necessarily "positive law." Rather, the text of the U.S. Code is *prima facie* evidence of the law of the United States; where the code conflicts with the Statutes at Large however, the Statutes at Large trump. *See U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993). Additionally, some parts of the code have been enacted into positive law; when this happens, the text of the code becomes evidence of the law. *See id.* at 448 n. 3 (citing to 1 U.S.C. § 204(a)); *see generally* Alice I. Youmans, et. al., *Questions & Answers*, 78 Law. Libr. J. 585, 590 (1986) (explaining the relationship between the U.S. Code, Statutes at Large, and positive law).

[14] *See e.g.* H.R. 3805 Rept. at 20.

*See id.* at 89-90 (emphasis added).  The legislative history of H.R. 3805 appears to characterize this and other "technical corrections" as "certain corrections of spelling, punctuation, and cross-references in title XVIII of the Social Security Act and in cross-references to the Internal Revenue Code."  *See* H.R. 3805 Rept. at 37.[15]  Moreover, the bill's sponsor, Rep. Dan Rostenkowski, noted when the bill was introduced: "I would like to emphasize that this bill intends simply to correct technical errors and to better reflect the policies established by the Congress in enacting the original legislation." 129 Cong. Rec. 23321, 23440 (1983).  H.R. 3805 did not contain any provisions relating to the jurisdiction of bankruptcy courts.

Although H.R. 3805 did not become law, in 1984 it was merged into another bill, H.R. 4170, which Congress passed as The Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (1984) (hereinafter, the "DRA").[16]  As noted in the bill itself, the general purpose of the DRA was "to provide for tax reform, and for deficit reduction." *See* 98 Stat. at 494.  The DRA did not contain any provisions relating to the scope of bankruptcy court jurisdiction.

The amendment to § 405(h) is located in "DIVISON V – SPENDING REDUCTION ACT OF 1984", "TITLE VI — OASDI, SSI, AFDC, AND OTHER

---

[15] The report similarly notes that where no descriptions are provided, the amendments are "clerical in nature." *Id.* at 1.

[16] *See* H.R. Rep. No. 98-432, pt. 2, at 1027 (1984) (explaining that "Title VI – Technical Corrections" of H.R. 4170 originated as the amended H.R. 3805).

PROGRAMS," "Subtitle D — Technical Corrections," "Sec. 2663. Other technical corrections in the Social Security Act and related provisions."   Consistent with the 1976 and 1982 codification (and the amendment originally proposed in H.R. 3805), section 2663(a)(4)(D) ordered that "Section 205(h) of [the Social Security Act] is amended by striking out 'section 24 of the Judicial Code of the United States' and inserting in lieu thereof 'section 1331 or 1346 of title 28, United States Code,'." *See* 98 Stat. at 1162.  Section 2664 of the DRA further requires that "[e]xcept to the extent otherwise specifically provided in this subtitle, the amendments made by section 2663 shall be effective on the date of the enactment of this Act; but none of such amendments shall be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date." *See id.* at 1171-72.

The House committee report on the DRA explains the reasons for the "technical corrections" of certain sections in the bill, but does not specifically address the amendments to § 405(h).  The report generally states that the "bill makes certain corrections of spelling, punctuation, cross-references and other clerical amendments to the Social Security Act and related provisions in the Internal Revenue Code." *See* H.R. Rep. No. 98-432, pt. 2, at 1663 (1984).  Nothing in the report or elsewhere in the legislative history, in so far as we have been able to determine, expresses any intention to change the jurisdiction of bankruptcy

19

courts, let alone to grant bankruptcy courts parallel authority with HHS over Medicare claims.

It thus appears that the current text of § 405(h) is the result of the Office of the Law Revision Counsel's mistaken codification, an error enacted into positive law by the DRA. While the Supreme Court has yet to speak on this precise issue, the Court has had reason to interpret § 405(h) in a number of cases that are helpful in resolving the current dispute. We thus turn to an examination of those cases before turning back to the codification issue.

B.    Supreme Court cases interpreting § 405(h)

The earliest relevant Supreme Court decision, *Salfi*, was decided prior to the DRA amendment to § 405(h). In *Salfi* the plaintiff brought suit to challenge the Social Security Administration's "duration-of-relationship requirements" as unconstitutional. 422 U.S. at 752-53. The district court exercised jurisdiction over the case pursuant to 28 U.S.C. § 1331. *Id.* at 755. While deciding the constitutional question against the plaintiff, more relevant for our purposes is the Court's analysis of the "serious question as to whether the District Court had jurisdiction over this suit" to begin with. *See Salfi*, *Id.* at 756.

In examining the requirements of § 405(h), the Court found that the third sentence, "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under (§ 1331 et seq.) of Title 28 to recover on

20

any claim arising under (Title II of the Social Security Act)"[17] should be read as more than merely a "codified requirement of administrative exhaustion" because the first two sentences of § 405(h) already require administrative exhaustion. *Id.* at 757.[18]  Those first two sentences prevent review of any decision of the Secretary other than as set out in § 405(g), which prescribes "typical requirements for review of matters before an administrative agency, including administrative exhaustion." *Id.* at 758.  The Court thus explained that the third sentence of § 405(h) acted to bar actions under § 1331, even where administrative remedies had been exhausted. *Id.* at 757.

Somewhat less than a decade later, the Court again considered § 405(h) again in *Heckler v. Ringer*, 466 U.S. 602 (1984). In *Ringer*, the underlying factual dispute involved "challenges to the policy of the Secretary of Health and Human Services (Secretary) as to the payment of Medicare benefits for a surgical procedure known as bilateral carotid body resection (BCBR)." *Id.* at 604-05.  The focus of the case was whether the plaintiff's claims "arose" under the Medicare Act.  *See e.g. id.* at 612-613.  But in characterizing § 405(h) and its own holding in

---

[17] As noted previously, the third sentence of § 405(h) at the time incorrectly referred to title 24 of the Judicial Code, and the Court's opinion inserted the correct cross-reference to the relevant section of Title 28 of the U.S. Code. *See id.* at 756 n. 3.  While surely strong evidence of how the Supreme Court reads § 405(h), *Salfi* did not raise the interpretive issue at the heart of this case, and thus does not dispose of the issue.

[18] The first two sentences read: "The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided."  42 U.S.C. § 405(h).

*Salfi*, the Court held that "[t]he third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." *Id.* at 614-15.

Perhaps most instructive is a more recent case, decided long after the 1984 DRA amendments to § 405(h), *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000). The plaintiffs in *Illinois Council* were an association of nursing homes challenging the legality and constitutionality of certain Medicare-related regulations. *Id.* at 5. As in *Ringer*, the key issue in *Illinois Council* was whether the plaintiff's claims "arose" under the Medicare Act (and were thus subject to the § 405(h) jurisdictional bar). *Id.* at 9-10.

However, in explaining the application of § 405(h) to the case, the Court again emphasized that the effect of § 405(h) was to reach beyond normal principles of "administrative exhaustion" and "ripeness," and prevent even the application of normal exceptions to those doctrines. *Id.* at 12. The Court held that § 405(h) "demands the 'channeling' of *virtually all legal attacks* through the agency." *Id.* at 13 (emphasis added). Moreover, the Court explained the balancing policy interests inherent in such a scheme:

> [I]t assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying "ripeness" and "exhaustion" exceptions case by case. But this assurance comes at

> a price, namely, occasional individual, delay-related hardship. In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified.

*Id.* at 13.  As the Court noted, whatever one may think of such a policy, it was clearly that chosen by Congress in creating § 405(h).[19]

A few salient points about § 405(h) are thus clear from the relevant Supreme Court cases.  *Salfi* makes clear that the first two sentences of § 405(h) require standard administrative exhaustion of remedies prior to bringing Medicare claims before a district court. *See Salfi*, 422 U.S. at 757.  Moreover, § 405(h) "demands the 'channeling' of virtually all legal attacks through the agency," making § 405(g) the "sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." *See Illinois Council*, 529 U.S. at 13; *Ringer*, 466 U.S. at 615-14.  However, we must acknowledge a common thread running through all three cases: each involved a suit brought under 28 U.S.C. § 1331, a jurisdictional grant that all parties agree was barred by § 405(h) prior to the 1984 amendments and continues to be barred after the amendments.[20]  Thus, none of these cases answers the

---

[19] *See id.* at 13 (noting that "[i]n any event, such was the judgment of Congress as understood in *Salfi* and *Ringer*").

[20] Similarly, to the extent our Court has addressed the reach of the jurisdictional bar of § 405(h) since the 1984 DRA amendments, it appears that the cases have been § 1331 cases. *See e.g. Dial v. Healthspring of Alabama, Inc.*, 541 F.3d 1044, 1047-48 (11th Cir. 2008); *Cochran v. U.S. Health Care Fin. Admin.*, 291 F.3d 775, 778-79 (11th Cir. 2002); *United States v. Blue Cross & Blue Shield of Alabama, Inc.*, 156 F.3d 1098, 1101 (11th Cir. 1998); *Am. Acad. of Dermatology*

question before us, namely, does § 405(h) bar jurisdiction under § 1334?  To further examine the question, we turn to the decisions of our sister circuits.

C.    Courts split over the application of § 405(h) to district courts

The decisions of our sister circuits (and the lower courts) fall into two categories. The first group of cases holds that the jurisdictional bar of § 405(h) applies to cases brought under § 1332 jurisdiction (*i.e.* diversity jurisdiction), notwithstanding the fact that § 1332 (like § 1334) is not mentioned in the statute. The second group of cases directly considers whether § 1334 jurisdiction can lie in the face of § 405(h).

1.    Cases holding that § 405(h) bars jurisdiction

The primary case among the first category of § 1332 decisions is from the Seventh Circuit in *Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*, 903 F.2d 480 (7th Cir. 1990).  In determining whether a review of plaintiff's claims in a district court was precluded by § 405(h), the Seventh Circuit noted the "curious" fact that § 405(h) on its face appears to bar "actions brought pursuant to federal

---

*v. Dep't of Health & Human Servs.*, 118 F.3d 1495, 1499 n. 8 (11th Cir. 1997); *Am. Fed'n of Home Health Agencies, Inc. v. Heckler*, 754 F.2d 896, 897-98 (11th Cir. 1984).  Both parties cite and discuss *V.N.A. of Greater Tift Cty., Inc. v. Heckler*, 711 F.2d 1020 (11th Cir. 1983).  Though *V.N.A.* was decided before the 1984 amendments, it appears the Court in that case cited to the Law Revision Counsel's 1976 (or 1982) re-codified version of the statute in its opinion.  *See V.N.A.*,  711 F.2d at 1024.  In a footnote of the opinion, the Court notes that "[t]here can be no question that § 405(h) fully applies to the present case, because the district court's jurisdiction is founded on 28 U.S.C. § 1331." *Id.*at n. 5.  We also note *Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1295 n. 3 (11th Cir. 2004), in which this Court assumed, but did not decide, that mandamus jurisdiction under § 1361 was not barred under § 405(h).  These cases do not address the issue of whether actions brought under § 1334 are barred by § 405(h).

question jurisdiction and actions brought against the United States but appears to permit actions brought pursuant to diversity jurisdiction." *See id.* at 488. However, the Seventh Circuit then analyzed the codification history described *supra,* holding that in § 2664(b) of the DRA Congress had "clearly expressed" its intent not to substantively change the scope of § 405(h). *Id.* at 489. Thus, because the statute prior to amendment had clearly barred diversity jurisdiction, the revised statute continued to bar diversity jurisdiction. *Id.*

Both the Third and Eighth circuits have subsequently adopted the holding and analysis of *Bodimetric*. See *Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 346-47 (3d Cir. 2012); *Midland Psychiatric Associates, Inc. v. United States*, 145 F.3d 1000, 1004 (8th Cir. 1998). An earlier Third Circuit case, *In re Univ. Med. Ctr., Inc.*, 973 F.2d 1065, 1073-74 (3d Cir. 1992), appears to suggest (but not hold) that § 405(h) may not apply to bankruptcy courts. However, that case involved a claim that HHS had violated an automatic bankruptcy stay. The court's opinion hinged on its holding that such a claim did not "arise" under the Medicare act. *Id.* at 1073. In *Nichole Med. Equip.*, the Third Circuit explicitly adopted *Bodimetric*, noting that "Congress clearly prohibited federal courts from exercising subject matter jurisdiction or diversity jurisdiction over claims arising under the [Medicare] Act." *See* 694 F.3d at 347.

25

Several circuits have thus addressed the question of whether § 405(h) bars districts court jurisdiction other than pursuant only to §§ 1331 and 1346.  Those circuits read the history of § 405(h) to conclude that the codification error acts to carry forward the original § 405(h)'s jurisdictional restrictions.[21]

2.    Cases holding that § 405(h) does not bar § 1334 jurisdiction

The second category of cases come first from the Ninth Circuit and begin with *In re Town & Country Home Nursing Servs.*, 963 F.2d 1146 (9th Cir. 1991). The court there was asked to determine if the failure to exhaust administrative remedies precluded a bankruptcy court from exercising jurisdiction over state law tort and contract claims "arising out of the government's setoff of Medicare overpayments."  *Id.* at 1154.  The Ninth Circuit held that "Section 405(h) only bars actions under 28 U.S.C. §§ 1331 and 1346; it in no way prohibits an assertion of jurisdiction under section 1334."  *Id.* at 1155.  The Ninth Circuit appears to have placed great weight on "section 1334's broad jurisdictional grant over all matters conceivably having an effect on the bankruptcy estate."  *Id.*  However, the court did not discuss or analyze the legislative history relied on in the *Bodimetric* line of cases.

---

[21] Although not squarely deciding the issue, a number of other circuit court decisions have suggested that § 405(h) bars jurisdictions other than pursuant to only §§ 1331 and 1346.  *See BP Care, Inc. v. Thompson*, 398 F.3d 503, 515 n. 11 (6th Cir. 2005) (citing favorably to *Bodimetric* analysis); *St. Vincent's Med. Ctr. v. United States*, 32 F.3d 548, 550 (Fed. Cir. 1994) (holding that Court of Federal claims jurisdiction barred by § 405(h)).  The First Circuit has recognized the issue, but declined to address it. *See In re Ludlow Hosp. Soc., Inc.*, 124 F.3d 22, 25 n. 7 (1st Cir. 1997) (recognizing, but avoiding, § 405(h) jurisdictional issue by deciding case on merits).

26

A later Ninth Circuit case, *Kaiser v. Blue Cross of California*, 347 F.3d 1107, 1114 (9th Cir. 2003), cites favorably to both *Bodimetric* and *Midland Psychiatric* for what those cases say about a claim that "arises under Medicare." It appears that the court in *Kaiser* assumed that the plaintiffs were proceeding under federal-question jurisdiction (which is indisputably precluded by § 405(h)), and thus the only relevant question was whether their claims "arose" under Medicare. But in a dicta discussion of whether there had been a waiver of sovereign immunity, the court noted that "11 U.S.C. § 106(a), which refers to waivers of sovereign immunity in bankruptcy proceedings, could not apply since any consideration of claims against the government in [debtor]'s bankruptcy would likely require consideration of the merits of the Medicare claims, again invoking 42 U.S.C. § 405(g)." *Id.* at 1117. Thus, *Kaiser* at least hints that the court would have come to the opposite conclusion of *In re Town & Country*, *i.e.* by holding that bankruptcy jurisdiction could not trump the exhaustion requirements of §§ 405(g) and (h).

A more recent Ninth Circuit decision, *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134 (9th Cir. 2010) attempted to address what it characterized as a possible conflict between *Kaiser* and *In re Town & Country*. The *Do Sung Uhm* court cites *Kaiser* for the proposition that "[j]urisdiction over cases 'arising under' Medicare exists only under 42 U.S.C. § 405(g), which requires an agency decision in

27

advance of judicial review." *Id.* at 1140-41. In a footnote though, the court

acknowledges the tension between *Kaiser*'s broad reading of § 405(h) and *In re*

*Town & Country*'s more narrow reading, but reconciles the two on the grounds that

*In re Town & Country* relied on the "special status" of bankruptcy court

jurisdiction over bankruptcy issues. *Id.* at 1141 n. 11.  The court concludes that *In*

*re Town & Country*'s reading of 42 U.S.C. § 405(h) applies "only to actions

brought under § 1334, while not bearing on the relationship between § 405(h) and

other jurisdictional provisions such as § 1332." *Id.*  The Ninth Circuit thus joins the

other circuit courts in unanimously opining that § 405(h) bars diversity jurisdiction

under § 1332, notwithstanding the omission of § 1332 from the text of § 405(h).

However, the Ninth Circuit is alone among circuit court decisions in reading

§ 405(h) to permit bankruptcy court jurisdiction over Medicare claims under §

1334.  Many lower courts have also considered the issue of § 1334 jurisdiction.

These lower courts have split, with some assuming jurisdiction,[22] and others

---

[22] *See e.g. In re Nurses' Registry & Home Health Corp.*, 533 B.R. 590, 593-97 (Bankr. E.D. Ky. 2015); *In re Slater Health Ctr., Inc.*, 294 B.R. 423, 428 (Bankr. D.R.I. 2003), *vacated in part*, 306 B.R. 20 (D.R.I. 2004), *aff'd*, 398 F.3d 98 (1st Cir. 2005); *In re Healthback, L.L.C.*, 226 B.R. 464, 472-74 (Bankr. W.D. Okla. 1998), *vacated*, *In re HealthBack, L.L.C.*, Case No. 97-22616-BH, 1999 WL 35012949 (Bankr. W.D. Okla. May 28, 1999); *First Am. Health Care of Georgia Inc. v. Dep't of Health & Human Servs.*, 208 B.R. 985, 988-90 (Bankr. S.D. Ga. 1996), *vacated and superseded sub nom.*, *First Am. Health Care of Georgia, Inc. v. U.S. Dep't of Health & Human Servs.*, Case No. 96-2007, 1996 WL 282149 (Bankr. S.D. Ga. Mar. 11, 1996); *In re Healthmaster Home Health Care, Inc.*, Case No. 95-10548, 95-01031A, 1995 WL 928920, at *1 (Bankr. S.D. Ga. Apr. 13, 1995); *In re Shelby Cty. Healthcare Servs. of AL, Inc.*, 80 B.R. 555, 557-60 (Bankr. N.D. Ga. 1987).

deciding jurisdiction was barred.[23]  Case going both ways have recognized and analyzed the codification error that led to the present omission of § 1334 from the text of § 405(h). *Compare e.g. In re Nurses' Registry & Home Health Corp.*, 533 B.R. 590, 593-97 (Bankr. E.D. Ky. 2015) (assuming jurisdiction under § 1334) *to In re St. Johns Home Health Agency, Inc.*, 173 B.R. 238, 245-46 (Bankr. S.D. Fla. 1994) (holding that § 1334 jurisdiction is barred).

We also note some limited scholarship addressing this issue as well. Articles written by members of the bankruptcy bar argue that under the "plain meaning" doctrine, bankruptcy courts' § 1334 jurisdiction is not barred by § 405(h).  *See* Samuel R. Maizel & Michael B. Potere, *Killing the Patient to Cure the Disease: Medicare's Jurisdictional Bar Does Not Apply to Bankruptcy Courts*, 32 Emory Bankr. Dev. J. 19, 66 (2015); Peter R. Roest, *Recovery of Medicare and Medicaid Overpayments in Bankruptcy*, 10 Annals Health L. 1, 1 (2001).  Conversely, an article written by current and former counsel for HHS argues that, based on the

---

[23] *Excel Home Care, Inc. v. U.S. Dep't of Health & Human Servs.*, 316 B.R. 565, 572-574 (D. Mass. 2004*); In re Hodges*, 364 B.R. 304, 305-6 (Bankr. N.D. Ill. 2007); *In re House of Mercy, Inc.*, 353 B.R. 867, 869-73 (Bankr. W.D. La. 2006); *In re Fluellen*, Case No. 05-40336 (ALG), 2006 WL 687160, at *1 (Bankr. S.D.N.Y. Mar. 13, 2006); *U.S., Dep't of Health & Human Servs. v. James*, 256 B.R. 479, 481-82 (W.D. Ky. 2000); *In re Hosp. Staffing Servs., Inc.*, 258 B.R. 53, 57-58 (S.D. Fla. 2000); *In re Mid-Delta Health Sys., Inc.*, 251 B.R. 811, 814-15 (Bankr. N.D. Miss. 1999); *In re Tri Cty. Home Health Servs., Inc.*, 230 B.R. 106, 108 n. 1 (Bankr. W.D. Tenn. 1999); *In re S. Inst. for Treatment & Evaluation, Inc.*, 217 B.R. 962, 965 (Bankr. S.D. Fla. 1998); *In re Home Comp Care, Inc.*, 221 B.R. 202, 206 (N.D. Ill. 1998); *In re AHN Homecare, LLC*, 222 B.R. 804, 807-10 (Bankr. N.D. Tex. 1998); *In re Orthotic Ctr., Inc.*, 193 B.R. 832, 835 (N.D. Ohio 1996); *In re St. Johns Home Health Agency, Inc.*, 173 B.R. 238, 245–46 (Bankr. S.D. Fla. 1994); *In re Upsher Labs., Inc.*, 135 B.R. 117, 117-20 (Bankr. W.D. Mo. 1991); *In re St. Mary Hosp.*, 123 B.R. 14, 16-18 (E.D. Pa. 1991).

legislative history, the amended § 405(h) should have the same effect as the prior version, *i.e.* barring bankruptcy court jurisdiction. *See* John Aloysius Cogan Jr. & Rodney A. Johnson, *Administrative Channeling Under the Medicare Act Clarified: Illinois Council, Section 405(h), and the Application of Congressional Intent*, 9 Annals Health L. 125, 125 (2000).

       3.     Mandamus jurisdiction and § 405(h)

We note in passing a related issue: whether § 405(h) bars mandamus jurisdiction exercised pursuant to 28 U.S.C. § 1361. As noted *supra,* n. 20, this circuit has not decided that issue. *See Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1295 n. 3 (11th Cir. 2004). The Supreme Court has also repeatedly declined to decide whether mandamus jurisdiction is prohibited by § 405(h). *See e.g. Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 456 n. 3 (1999). However, the great weight of authority from other circuits has almost uniformly found that § 405(h) does not necessarily deprive district courts of mandamus jurisdiction over Medicare claims.[24]

Superficially at least, there is some commonality between the issue in those cases regarding § 1361, and the issue in our case involving § 1334, because both

---

[24] *See e.g. Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 766 (5th Cir. 2011); *Cordoba v. Massanari*, 256 F.3d 1044, 1047 (10th Cir. 2001); *Buchanan v. Apfel*, 249 F.3d 485, 491–92 (6th Cir. 2001); *Briggs v. Sullivan*, 886 F.2d 1132, 1142 (9th Cir. 1989); *Burnett v. Bowen*, 830 F.2d 731, 738 (7th Cir. 1987); *Ganem v. Heckler*, 746 F.2d 844, 851-52 (D.C. Cir. 1984); *Kuehner v. Schweiker*, 717 F.2d 813, 819 (3d Cir. 1983), *judgment vacated sub. nom. on other grounds*, *Heckler v. Kuehner*, 469 U.S. 977 (1984); *Belles v. Schweiker*, 720 F.2d 509, 513 (8th Cir. 1983); *Ellis v. Blum*, 643 F.2d 68, 81 (2d Cir. 1981).

jurisdictional provisions are not listed in the text of § 405(h). The commonality is just that though, superficial. As Judge Friendly of the Second Circuit accurately explained, when § 405(h) was passed in 1939, mandamus jurisdiction was not one of the jurisdictional provisions contained in Section 24 of the Judicial Code. *See Ellis v. Blum*, 643 F.2d 68, 81 (2d Cir. 1981).[25] Thus, unlike § 1334, there is no argument to be made that the codification of section 24 into Title 28 had any impact on the availability of mandamus relief under § 1361. *See id.; see also Ganem v. Heckler*, 746 F.2d 844, 851 (D.C. Cir. 1984) (noting that absence of § 1361 was unrelated to codification error because even in original version of § 405(h), § 24 of the Judicial Code did not include District of Columbia's common law jurisdiction to issue mandamus writs).

However, the issue of whether a district court can exercise mandamus jurisdiction related to Medicare claims, notwithstanding the § 405(h) bar, is neither in front of the court, nor necessary to resolve the current dispute. As previously,

---

[25] In fact, at that time only district courts in the District of Columbia could exercise mandamus jurisdiction, pursuant to an uncodified grant of authority dating back to the early nineteenth century and the District of Columbia's adoption of Maryland law. *See id.* District courts elsewhere in the country were granted mandamus jurisdiction explicitly when Congress passed the Mandamus and Venue Act, Pub. L. No. 87-748, 76 Stat. 744 (1962). Judge Friendly reasoned that Congress likely did not intend to bar District of Columbia courts' mandamus jurisdiction when it passed § 405(h) because that uncodified jurisdiction was not specifically excluded, and Congress similarly did not intend mandamus jurisdiction to suddenly become subject to § 405(h) when mandamus jurisdiction was extended to other courts in 1962. *See Ellis*, 643 F.2d at 81.

31

we thus decline to decide the issue.  *See Lifestar Ambulance Serv.*, 365 F.3d at 1295 n. 3.

      D.     The Bankruptcy Court Lacked Jurisdiction Under § 405(h)

With that considerable background in mind, we turn now to the issue in this case: did 42 U.S.C. § 405(h) bar the bankruptcy court below from taking jurisdiction over Bayou Shore's Medicare provider agreement under 28 U.S.C. § 1334?  Because we are persuaded that the 1984 amendments to § 405(h) were a codification and not a substantive change, we align ourselves with the Seventh, Eighth, and Third Circuits and hold that § 405(h) bars § 1334 jurisdiction over claims that "arise under [the Medicare Act]."

      1.     The Deficit Reduction Act of 1984 amendment to § 405(h) was a codification and did not substantively change the law.

Bayou Shores' primary argument, and the primary argument of courts holding that § 1334 jurisdiction is not barred § 405(h), is relatively straightforward: the text of the third sentence of § 405(h) does not mention § 1334, and thus, under the "plain meaning" of the statute § 1334 jurisdiction is not barred by § 405(h). Bayou Shores is certainly correct that "when [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks and citations removed); *see also Owner-*

*Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1327 (11th Cir. 2010) (holding that "[t]here is no reason for this Court to rewrite a statute because of an alleged scrivener error unless a literal interpretation would lead to an absurd result.")

But that is not the end of the analysis because this case is governed by a particular canon in statutory construction regarding the codification of law, *i.e.* the process of converting and organizing the Statues at Large into the U.S. Code. Since virtually the founding of the Republic, it has been recognized that when legislatures codify the law, courts should presume that no substantive change was intended absent a clear indication otherwise. For example, in the oldest case we have been able to locate,[26] *Taylor v. Delancy*, 2 Cai. Cas. 143, 151 (N.Y. Sup. Ct. 1805), the New York Supreme Court of Judicature[27] held "that where the law, antecedently to the revision was settled, either by clear expressions in the statutes, or adjudications on them, the mere change of phraseology shall not be deemed or construed a change of the law, unless such phraseology evidently purports an intention in the legislature to work a change."

---

[26] The difficulties inherent in codifying and organizing the law are older still, and plagued even the earliest democracy. Aristotle notes that after the Athenian statesmen Solon "had organized the [Athenian] constitution in the manner stated, people kept coming to him and worrying him about his laws, criticizing some points and asking questions about others," causing him to leave Greece for Egypt for the next ten years. *See* ARISTOTLE, THE ATHENIAN CONSTITUTION, Ch. 11 (H. Rackham trans., Cambridge, MA, Harvard University Press 1952).

[27] The Supreme Court of Judicature was the "highest common-law" state court in New York at that time. *See William J. Jenack Estate Appraisers & Auctioneers, Inc. v. Rabizadeh*, 22 N.Y.3d 470, 478 (2013).

The Supreme Court appears to have recognized the canon at least as early as *Stewart v. Kahn*, 78 U.S. 493, 502 (1870), where the Court held that "[a] change of language in a revised statute will not change the law from what it was before, unless it be apparent that such was the intention of the legislature." The Court reiterated the principle in *United States v. Ryder*, 110 U.S. 729, 740 (1884), holding that "[i]t will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed." This canon of statutory construction has remained undisturbed since that time. *See e.g. McDonald v. Hovey*, 110 U.S. 619, 629 (1884); *Logan v. United States*, 144 U.S. 263, 302 (1892), *abrogated on other grounds*, *Witherspoon v. State of Ill.*, 391 U.S. 510 (1968); *Holmgren v. United States*, 217 U.S. 509, 520 (1910); *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 199 (1912); *United States v. Sischo*, 262 U.S. 165, 168-69 (1923); *Hale v. Iowa State Bd. of Assessment & Review*, 302 U.S. 95, 102 (1937); *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 227 (1957); *United States v. FMC Corp.*, 84 S. Ct. 4, 7 (Goldberg, Circuit Justice 1963); *United States v. Welden*, 377 U.S. 95, 98 n. 4 (1964); *Tidewater Oil Co. v. United States*, 409 U.S. 151, 162 (1972); *Cass v. United States*, 417 U.S. 72, 82 (1974); *Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)*, 422 U.S. 289, 309  n. 12 (1975); *Muniz v. Hoffman*, 422 U.S. 454, 470 (1975); *Fulman v. United States*, 434

34

U.S. 528, 538 (1978); *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 318 (1985); *Finley v. United States*, 490 U.S. 545, 554 (1989); *Ankenbrandt v. Richards*, 504 U.S. 689, 700 (1992); *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993); *Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 20 (2006); *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008).

As it happens, a number of these cases from the 20th century arise from an event that directly touches on the issues in our case: the 1948 recodification of the Judicial Code.[28]

In one of the earlier cases to examine the 1948 recodification, *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222 (1957), the Court considered whether the recodification had substantively changed venue rules in patent cases. The issue was whether or not the specific patent venue statute, 28 U.S.C. § 1400(b) was supplemented by the more general (and more expansive) civil suit venue statute, 28 U.S.C. § 1391. *Id.* at 222.  The Court first noted that in a pre-1948 recodification case, *Stonite Products Co. v. Melvin Lloyd Co.*, 315 U.S. 561 (1942), the Court had already determined that the more specific patent venue provisions in the old Judicial Code of 1911 trumped more general venue provisions

---

[28] The 1948 recodification moved "section 24 of the Judicial Code" to Title 28 of the U.S. Code, but 42 U.S.C. § 405(h) continued to refer to "section 24 of the Judicial Code" until the DRA amendment in 1984.

for civil suits.[29]  The only issue therefore was whether the 1948 recodification (which recodified § 48 of the Judicial Code to 28 U.S.C. § 1400(b)) had substantively changed the patent venue statute. *Fourco Glass*, 353 U.S. at 225. Noting that neither the legislative history, nor the Reviser's Notes, indicated that any substantive change was intended, the Court reasoned that "[t]he change of arrangement, which placed portions of what was originally a single section in two separated sections cannot be regarded as altering the scope and purpose of the enactment. For it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed." *Id*. at 227 (internal quotation marks and citations omitted) (quoting from *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 198 (1912)).  The Court thus held that no substantive change to 28 U.S.C. § 1400(b) had occurred during the 1948 recodification and the result in *Stonite Products* dictated the outcome of the case. *Id.* at 227-28.

Similarly, in *Tidewater Oil Co. v. United States*, 409 U.S. 151, 162 (1972), the Court rejected the argument that the 1948 Judicial Code revisions substantively changed the existing law concerning appellate court jurisdiction over interlocutory appeals in Government civil antitrust cases.  The 1948 revision to 28 U.S.C. § 1292(a)(1) allowed interlocutory appeals of district court order to the courts of

---

[29] *Compare* Judicial Code, Pub. L. No. 61-475, 36 Stat. 1087, § 48 (1911) *with id*. at § 52.

36

appeals, "except where a direct review may be had in the Supreme Court." *Id.*

Under then-existing law, appellate courts had no jurisdiction over any appeals in

Government civil antitrust cases (which were appealed directly to the Supreme

Court), and interlocutory appeals to the Supreme Court in Government civil

antitrust cases were not permitted. *Id.* at 154-56, 160.  The Court thus reasoned that

a possible interpretation of the new language added by the 1948 revisions, "except

where a direct review may be had in the Supreme Court," was that appellate court

jurisdiction over interlocutory appeals in Government civil anti-trust cases was

now available (contrary to prior law) because "direct review" in the Supreme Court

of an interlocutory appeal could not "be had."  *Id.* at 162.

Citing to *Fourco Glass*, the Court rejected that interpretation because no

such change to existing law had been "clearly expressed" by the 1948 revisions.

"To the contrary, the Revisers' Notes fail to reveal any intention to expand the

scope of the pre-existing jurisdiction of the courts of appeals over interlocutory

appeals; the new § 1292 is described merely as a consolidation of a number of

previously separate code provisions—including the general interlocutory appeals

provision—'with necessary changes in phraseology to effect the consolidation.'"

*Id.* at 162-63.  The Court thus concluded that the 1948 revisions did not

substantively expand the jurisdiction of appellate courts. *Id.* at 163.

*Muniz v. Hoffman*, 422 U.S. 454, 456-57 (1975) arose out of a labor dispute between the San Francisco Typographical Union and a local daily newspaper, in which the union and its officers had been cited for criminal contempt in violating certain court orders and subsequently denied a jury trial in the criminal contempt proceedings.  A key issue in the case was whether the Wagner and Taft-Hartley Acts,[30] which authorized courts to grant certain injunctions, permitted jury trials to those found in contempt of the injunctions. *Id.* at 461.  The parties appeared to agree that prior to the 1948 revisions of the Criminal Code,[31] a contemnor had no right to a jury trial in contempt actions to enforce injunctions issued under the Wagner and Taft-Hartley Acts, notwithstanding the jury requirements in § 11 of the earlier passed Norris-LaGuardia Act.[32]  Petitioners argued however that in recodifying § 11 of Norris-LaGuardia as 18 U.S.C. § 3692 in 1948, Congress had overruled its prior policy of not permitting jury trials in contempt actions to enforce injunctions issued under the Wagner and Taft-Hartley Acts.  *Id.* at 467.

---

[30] National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935) (the "Wagner Act"); Labor Management Relations Act, Pub. L. No. 80-101, 61 Stat. 136 (1947) (the "Taft-Harley Act").

[31] As the Court notes, the 1948 revision to the Criminal Code followed a "parallel course" to the revision to the Judicial Code, and was prepared by the same staff of experts. *See Muniz*, 422 U.S. at 470 n. 10.

[32] Injunctions in Labor Disputes, Pub. L. No. 72-65, 47 Stat. 70 (1932) (the "Norris-LaGuardia Act"). §11 of the Norris-LaGuardia Act provided jury trials in certain contempt actions, but unquestionably did not provide a jury right in contempt actions arising out of injunctions issued pursuant to the Wagner or Taft-Harley Acts. *See Muniz*, 422 U.S. at 462-463.

The Court rejected this argument, holding that "[w]e cannot accept the proposition that Congress, without expressly so providing, intended in § 3692 to change the rules for enforcing injunctions," which rules existed when § 11 was originally passed. *See Muniz*, 422 U.S. at 468. The Court examined the legislative history of the recodification and the Reviser's Notes, which consistently expressed that no substantive change was intended by the revision. *Id.* at 467-469. Citing *Fourco Glass*, the Court reiterated the longstanding rule that "[n]o changes of law or policy…are to be presumed from changes of language in the revision unless an intent to make such changes is clearly expressed." *Id.* at 472 (internal quotation marks omitted). The Court thus expressed some incredulity at the proposition that the major policy change petitioners argued for could be effected by Congress without any mention of it in any of the legislative history or notes:

> In view of the express disavowals in the House and Senate Reports on the revisions of both the Criminal Code and the Judicial Code, it would seem difficult at best to argue that a change in the substantive law could nevertheless be effected by a change in the language of a statute without any indication in the Revisers' Note of that change. It is not tenable to argue that the Revisers' Note to § 3692, although it explained in detail what words were deleted from and added to what had been § 11 of the Norris-LaGuardia Act, simply did not bother to explain at all, much less in detail, that an admittedly substantial right was being conferred on potential contemnors that had been rejected in the defeat of the Ball amendment the previous year and that, historically, contemnors had never enjoyed.

*See id*. at 472.

*Finley v. United States*, 490 U.S. 545, 553-54 (1989), involved a question of whether the 1948 recodification of the Judicial Code substantively created new "pendent-party" jurisdiction when it recodified the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (the "FTCA").[33]  Writing for the Court, Justice Scalia rejected that argument, holding that "[u]nder established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed."  *Id.* at 554 (internal quotation marks omitted) (quoting from *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 199 (1912) and citing to *United States v. Ryder*, 110 U.S. 729, 740 (1884)).  Finding "no suggestion, much less a clear expression, that the minor rewording at issue here imported a substantive change," the Court held that the pre-codification interpretation of the statute continued to hold (*i.e.* no "pendent-party" jurisdiction under the FTCA). *Id.* at 554-56.

Finally, our own court has recently applied this canon in *Koch Foods, Inc. v. Sec'y, U.S. Dep't of Labor*, 712 F.3d 476 (11th Cir. 2013).  There we held that certain amendments to 49 U.S.C. § 31105 enacted by the Revision of Title 49, United States Code Annotated, "Transportation", Pub. L. No. 103-272, 108 Stat. 745 (1994) were simply revisions and codifications, and thus did not change the

---

[33] "Pendent-party" jurisdiction is "jurisdiction over parties not named in any claim that is independently cognizable by [a] federal court." *See Finley*, 490 U.S. at 549.  As opposed to "pendent-claim" jurisdiction, which is "jurisdiction over nonfederal claims between parties litigating other matters properly before the court." *Id.* at 548.

pre-amendment scope of the law. *Koch Foods*, 712 F.3d at 485. We noted in *Koch Foods* that (much like § 2664(b) of the DRA amendments here) the recodification statute cautioned that the revisions and codifications were enacted "without substantive change," and that the legislative history (like the legislative history of the DRA here) emphasized that the changes were not substantive. *Id.* The interpretive canon used in *Koch Foods* is the one we use in this case: "As the Supreme Court has observed, 'it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.'" *Id.* at 486 (quoting from *Finley*, 490 U.S. at 554).

We turn then to applying the recodification canon of statutory construction to our case. It is clear that the Office of the Law Revision Counsel made an error in revising § 405(h) in 1976 (and again in 1982). Rather than include the full range of jurisdictional grants that were clearly forbidden under the prior law,[34] the Law Revision Counsel (who it must be recalled has no authority to pass laws or alter the jurisdiction of federal district courts)[35] mistakenly decided to update the cross-reference only to § 1346 and § 1331 of the new Title 28. We find no indication whatsoever, let alone a "clear indication," in the Law Revision Counsel's

---

[34] *I.e.* each district court jurisdictional grant listed in Section 24 of the Judicial Code of 1911.

[35] *See e.g. N. Dakota v. United States*, 460 U.S. 300, 311 n. 13 (1983) (noting that the editorial decisions made by a codifier without the approval of Congress should be given no weight in interpreting a statute).

41

Codification note that the revisers intended or were suggesting an expansion of district court jurisdiction to review Medicare and Social Security claims, thereby reversing forty years of Congressional policy. On the contrary, the title of the note ("Codification") and its contents indicate that the change was a mere codification (*i.e.* updating the cross-reference to "section 24 of the Judicial code" to its new location in Title 28 of the U.S. Code), and not a substantive change.  One would expect that if the revisers intended the kind of fundamental change in policy and expansion of the jurisdiction of bankruptcy courts that Bayou Shores suggests, it would merit *some* mention. *See Muniz*, 422 U.S. at 472 ("It is not tenable to argue that the Revisers' Note …, although it explained in detail what words were deleted … and added …, simply did not bother to explain at all, much less in detail, that an admittedly substantial right was being conferred…").

Moreover we do not find it significant, contrary to Bayou Shores' suggestion, that Congress enacted the error into positive law when it passed the DRA in 1984.  There is no evidence in the DRA that Congress "clearly expressed" an intention to reverse decades of Medicare and Social Security Act policy and give bankruptcy courts parallel jurisdiction with HHS to adjudicate Medicare claims (and parallel jurisdiction with the Social Security Administration to adjudicate Social Security claims).  Again, if Congress intended such an important expansion of bankruptcy court jurisdiction to be enacted in a recodification, one

42

would expect to find some indication in the statute or legislative history stating as much. *See Tidewater Oil*, 409 U.S. at 162-63 (finding no indication in Reviser's Notes or legislative history that Congress intended recodification to expand federal appellate court jurisdiction). Bayou Shores points to no such indication, nor are we able to find one.

To the contrary, the *statute itself* tells us that the amendment in question is not to be interpreted as making any substantive change to the law: "none of such amendments shall be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date." *See* DRA, § 2664(b); *see also Koch Foods*, 712 F.3d at 485 (noting that the statute "expressly states that no substantive change is intended by the revisions to the language").[36] The legislative history of the bill similarly emphasizes that the amendments in § 2663 (including the amendment to § 405(h)) were not intended to be substantive. *See* H.R. Rep. No. 98-432, pt. 2, at 1663 (1984) (noting that the bill "makes certain corrections of spelling, punctuation, cross-references and other clerical amendments to the Social Security Act and related provisions in the Internal Revenue Code"). Rep. Dan Rostenkowski (the original sponsor of H.R.

---

[36] The bankruptcy court referred to § 2664(b) as "legislative history." *See In re Bayou Shores,* 525 B.R. at 167. Strictly speaking, that is not correct. "Legislative history" refers to "proceedings leading to the enactment of a statute, including hearings, committee reports, and floor debates." *Black's Law Dictionary* (10th ed. 2014). Conversely, § 2664(b) of the DRA is positive law: it is part of a statute that was passed by Congress and signed into law by the President.

43

3805, containing the "technical corrections" that were merged into the DRA) "emphasize[d] that this bill intends simply to correct technical errors and to better reflect the policies established by the Congress in enacting the original legislation." 129 Cong. Rec. 23321, 23440 (1983).

Per long standing Supreme Court precedent, we "will not … infer[] that the legislature, in revising and consolidating [§ 405(h)] intended to change their policy, unless such intention be clearly expressed." *See United States v. Ryder*, 110 U.S. 729, 740 (1884).  Here, we find no clear expression of any intent to change Congressional policy with respect to bankruptcy court jurisdiction over Medicare claims.  To the contrary, the statute and legislative history detailed above expresses an intent *not* to substantively amend § 405(h).[37]

In reply, Bayou Shores attempts to downplay the mandate of § 2664(b) in the DRA by arguing that despite the statute's command that the amendments are not to be interpreted as substantive, certain of the amendments were in fact substantive.  *See* Appellant's Reply Br. at 2-9. We are not persuaded by this argument.  As an initial matter, Bayou Shores essentially asks us to ignore § 2664(b) and Congress's command that the amendments are not substantive, which

---

[37] The Seventh Circuit's *Bodimetric* decision (and thus the decisions of the Third and Eighth Circuits adopting *Bodimetric*) recognized and correctly applied this recodification canon of statutory interpretation. *See Bodimetric*, 903 F.2d at 489 (citing to *Muniz* and *U.S. v. Ryder*). Conversely, the cases holding that § 405(h) does not bar jurisdiction under § 1334 do not appear to have recognized the existence of the canon, let alone analyzed whether it applies to this issue. It is clear that in ignoring a canon of statutory construction that courts have been applying for more than a century, these latter courts erred.

44

we are clearly not free to do.  In *Muniz* the Supreme Court indicated that "[t]he nature of the revision process itself requires the courts, including this Court, to give particular force to the many express disavowals in the House and Senate Reports of any intent to effect substantive changes in the law." *See Muniz*, 422 U.S. at 472 n. 11.  Here we think it most reasonable to give force to Congress's express disavowals in the DRA itself and in the legislative history "of any intent to effect substantive changes in the law."

Moreover, the two examples that Bayou Shores cites as "substantive" amendments in § 2663 of the DRA are, on closer review, at least arguably non-substantive. First, Bayou Shores argues that § 2663(e)(3) of the DRA expanded criminal liability for impersonating certain persons in order to obtain information about their Social Security benefits.  Appellant's Reply Br. at 3-4.  The language in § 2663(e)(3) orders that "Section 1107(b) of [the Social Security Act] is amended by striking out 'former wife divorced,' each place it appears and inserting in lieu thereof 'divorced wife, divorced husband, surviving divorced wife, surviving divorced husband, surviving divorced mother, surviving divorced father,'."  The House committee report on the bill indicates that this amendment was intended to bring Section 1107(b) into conformity with an earlier amendment eliminating

45

gender-based distinctions in the Social Security Act.[38]  Thus, arguably the earlier

amendment had already eliminated gender distinctions in Section 1107(b), and the

DRA amendments merely revised the text of Section 1107(b) to correctly reflect

those earlier amendments.[39]

Second, Bayou Shores points to §2663(a)(15)(C), and characterizes it as

denying certain benefits to college students that they otherwise would have

received under the prior version of the statute.  Appellant's Reply Br. at 5.  The

relevant text of the amendment orders that "(C) Section 222(b)(4) of such Act is

amended by striking out 'full–time student' and inserting in lieu thereof 'full-time

elementary or secondary school student'."  *See* DRA at §2663(a)(15)(C).  A close

reading of the legislative history suggests that Bayou Shores is mistaken about this

provision as well.  Section 222(b)(4) of the Social Security Act (codified at 42

---

[38] *See* H.R. Rep. No. 98-432, pt. 2, at 1659 (1984) ("While the Social Security Amendments of 1983 sought to eliminate all gender-based distinctions in the Social Security Act, this gender-based distinction was not eliminated by those amendments. In order to assure that the Social Security Act provides the same penalty for fraud regardless of sex, the bill provides that the penalty for fraud would also apply to an individual who falsely represents that he is the divorced husband of a worker or beneficiary.")

[39] Even assuming Bayou Shores is correct that this provision substantively changed existing law, it would not change the result in this case.  The House report indicates the "clear intent" behind the amendment to Section 1107(b) (whether substantive or not), whereas nothing in the legislative history indicates a "clear intent" to change the jurisdiction of bankruptcy courts with the amendment to § 405(h).  Thus, the amendment to Section 1107(b) is not analogous to the amendment to § 405(h).  It is certainly possible that Congress intended to make substantive amendments in the codification and revision section of the DRA.  However, under *United States v. Ryder* and its progeny we require *some* indication that a substantive change in the revision was intended.  *See e.g. Ex parte Collett*, 337 U.S. 55, 65-71 (1949) (explaining that reviser's notes and legislative history made clear that addition of 28 U.S.C. § 1404(a), which made forum non coveniens transfers available in any district court civil action, was a substantive amendment enacted by the 1948 Judicial Code revision).

46

U.S.C. § 422) was added by Congress in 1965.[40]  At the time § 222(b)(4) was added to the larger section, the term "full-time student" was "as defined and determined under section 202(d)."[41]  Turning then to Section 202(d), that section was amended in 1981 (prior to the DRA in 1984) in a section titled "Elimination of child's insurance benefits in the case of children age 18 through 22 who attend postsecondary schools."[42]  The 1981 amendment makes clear that "full time student" was to be defined as elementary and high-school students, not college students.[43]  A Senate report issued the following year noted that under the prior law children beneficiaries could receive benefits until they were 22 as long as they were in school, while the 1981 amendments eliminated those benefits for anyone over 18 attending post-secondary schooling.[44]  It thus appears that the 1984 amendment in the DRA referenced by Bayou Shores was a "technical correction" because it simply updated § 222(b)(4) of the statute to be consistent with the definitions in the earlier amended § 202(d).

---

[40] *See* Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 at § 306(14) (1965).

[41] Section 202 of the Social Security Act is codified at 42 U.S.C. § 402.  The current statute continues to refer to section 202 for its definition of "full-time elementary or secondary school student."

[42] *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357 at §2210 (1981).

[43] *See id.* ("SEC. 2210. (a)(1) Section 202(d) of the Social Security Act is amended … by striking out 'full-time student' each place it appears and inserting in lieu thereof 'full-time elementary or secondary school student'.")

[44] *See* S. Rep. No. 97-314, Vol. I, at 106 (1982).

Finally, even if we assume for the sake of argument that Bayou Shores has correctly identified two substantive changes in § 2663, the examples Bayou Shores relies on are minor substantive amendments at best, compared to the massive shift in policy that giving bankruptcy courts parallel authority to adjudicate Medicare disputes would represent. This is akin to finding a few hidden firecrackers in the bill and thus inferring the presence of an atomic bomb. In other words, the presence of two minor substantive changes in § 2663 (assuming they are substantive), can hardly justify interpreting the amendment to § 405(h) as enacting a significant change in Congressional policy by creating bankruptcy court jurisdiction over Medicare claims.

Therefore, we conclude that because the previous version of § 405(h) precluded bankruptcy court review of Medicare claims under § 1334, so too must the newly revised § 405(h) bar such actions.

> 2. § 1334 does not give bankruptcy courts special jurisdiction over Medicare claims

In light of the above explanation, this Court is constrained to disagree with the Ninth Circuit's *In re Town & Country* opinion, and thus holds that § 405(h) bars a bankruptcy court acting pursuant to § 1334 from exercising jurisdiction over Medicare claims. However, both the Ninth Circuit in *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134 (9th Cir. 2010) and Bayou Shores here argue that § 1334 has a

"special status" that is different and distinct from other jurisdictional provisions (such as § 1332).[45] In particular, Bayou Shores argues that the text of § 1334(b) itself defines the expansive nature of bankruptcy court jurisdiction: "notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11." *See* 28 U.S.C. § 1334(b). However, we read the Supreme Court's opinion in *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991) as effectively foreclosing that argument.

In *MCorp Fin.*, the Court held that bankruptcy law's automatic stay provision (11 U.S.C. § 362) could not stay an administrative proceeding by the Board of Governors of the Federal Reserve System against MCorp Financial. The Court first found that the administrative proceeding fell squarely into the exception in § 362 for proceedings to enforce a "governmental unit's police or regulatory power." *Id.* at 39-40.[46] The Court rejected MCorp Financial's argument that for the exception to apply, the bankruptcy court would need to determine in the first instance whether the exercise of regulatory power was legitimate; the Court held that such a reading "would require bankruptcy courts to scrutinize the validity of

---

[45] *See e.g.* Appellant's Reply Br. at 9-12.

[46] The parties dispute a similar question on appeal. However, our decision that the bankruptcy court lacked subject matter jurisdiction over the provider agreements renders moot the question of whether HHS's actions fall in § 362's exceptions. We thus decline to decide that issue.

every administrative or enforcement action brought against a bankrupt entity," and that "[s]uch a reading is problematic, both because it conflicts with the broad discretion Congress has expressly granted many administrative entities and because it is inconsistent with *the limited authority Congress has vested in bankruptcy courts*." *Id.* at 40 (emphasis added).

Importantly, the Court rejected MCorp's broad reading of 28 U.S.C. § 1334(b), holding that "[s]ection 1334(b) concerns the allocation of jurisdiction between bankruptcy courts and other 'courts,' and, of course, an administrative agency such as the Board is not a 'court.'" *Id.* at 41-42. That is precisely the situation here: Bayou Shores' provider agreement was terminated by the Centers for Medicare & Medicaid Services ("CMS"), which is an administrative agency within HHS and not a "court." Thus, § 1334(b) does not concern the allocation of jurisdiction between the bankruptcy court and HHS, and cannot trump the § 405(h) jurisdictional bar.

Bayou Shores raises an additional argument relating to the 1984 amendments to § 1334. Bayou Shores points out that the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat 333 (July 10, 1984) (the "Bankruptcy Act") was passed only eight days prior to passage of the DRA, and among other things significantly enlarged the scope of bankruptcy court

jurisdiction.[47]  According to Bayou Shores, because "28 U.S.C. § 1334 was enacted first, and 42 U.S.C. § 405(h) was enacted days later," Congress's failure to include § 1334 in § 405(h) indicates a positive intent to expand the scope of bankruptcy court jurisdiction.  Appellant's Br. at 45.  We disagree.  *See N. L. R. B. v. Plasterers' Local Union No. 79, Operative Plasterers' & Cement Masons' Int'l Ass'n, AFL-CIO*, 404 U.S. 116, 129-30 (1971) ("The Court has frequently cautioned that it is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law.") (quotation marks omitted).

As an initial matter, reading too much into the significance of the timing of the passage of these acts is at best speculative, particularly since the DRA had nothing to do with bankruptcy court jurisdiction, nor does Bayou Shores point to any evidence suggesting that Congress had the Bankruptcy Act in mind when passing the DRA.[48]  Moreover Bayou Shores' timing argument also cuts the opposite way: one would equally expect that if Congress were inclined to expand the jurisdiction of bankruptcy courts to include hearing Medicare and Social Security claims, it would have done that in the Bankruptcy Act that it had just

---

[47] The Bankruptcy Act added subsection 1334(b), discussed *supra. See* Bankruptcy Act at § 101(a).

[48] Approximately forty-some public laws were passed by Congress in July of 1984.  *See* https://www.congress.gov/public-laws/98th-congress.  We are skeptical of the suggestion that the temporal proximity between any one of these laws and the Bankruptcy Act, standing alone, has any particular significance in interpreting any of these laws.

passed, rather than burying it as a "Technical Correction" in a bill wholly unrelated to bankruptcy courts (*i.e.* the DRA).

> ### 3.    Barring bankruptcy court jurisdiction is consistent with Congressional Medicare policy

The bankruptcy court also relied on what was essentially a policy argument about the wisdom of allowing a bankruptcy court rather than HHS to adjudicate Medicare claims:

> Consider the following hypothetical: a debtor that operates a skilled nursing facility has its Medicare provider agreement terminated because it was improperly cited for noncompliance. The debtor immediately appeals the finding of noncompliance. But because CMS stops payment for Medicare residents, the debtor is forced to file for bankruptcy. If the Court were to adopt HHS's view, the debtor in that hypothetical scenario could never assume its Medicare provider agreement since it is highly unlikely the appeals process will be complete before the debtor files for bankruptcy.

*See In re Bayou Shores*, 525 B.R. at 169.[49]  In other words, unless the bankruptcy court can take jurisdiction over the provider agreements, Bayou Shores would

---

[49] *See also* Samuel R. Maizel & Michael B. Potere, *Killing the Patient to Cure the Disease: Medicare's Jurisdictional Bar Does Not Apply to Bankruptcy Courts*, 32 Emory Bankr. Dev. J. 19, 27-29 (2015) (noting that because of the length of the HHS appeals process, a hospital could be faced with the "fatal dilemma" of being put out of business before being able to challenge an adverse HHS decision); *but see Oakland Med. Grp., P.C. v. Sec'y of Health & Human Servs., Health Care Fin. Admin.*, 298 F.3d 507, 511 (6th Cir. 2002) ("[T]he government has a strong interest in expediting provider-termination procedures because: (1) the Secretary's responsibility for insuring the safety and care of elderly and disabled Medicare patients is of primary importance, and (2) the government has a strong interest in minimizing the expenses of administering the Medicare program.") (internal quotation marks and citations omitted); *Northlake Cmty. Hosp. v. United States*, 654 F.2d 1234, 1242 (7th Cir. 1981) (explaining that "a

cease to exist as a going concern long before the HHS administrative appeals process could complete.[50]

While we are not unsympathetic to this argument, the choice of whether the bankruptcy court or HHS is best positioned to adjudicate Medicare claims is a policy decision that the bankruptcy court was not empowered to make. As explained at length above, § 405(h) and (g) restricts the role of district courts to a limited review of final HHS decisions, thus reflecting Congressional policy to let HHS adjudicate those claims in the first instance.  The Supreme Court explained in *Illinois Council* that the review provisions of § 405(h) and (g) give HHS a greater opportunity to "apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts." *See* 529 U.S. at 13.

Indeed, the bankruptcy court's actions here illustrate the kind of "premature interference" that *Illinois Council* had in mind.  While the bankruptcy court went to great length to deny that it was reviewing the merits of HHS's findings or decisions (*see e.g. In re Bayou Shores SNF*, 525 B.R. at 168), that is effectively what the bankruptcy court did.  After holding an evidentiary hearing on the

provider's financial need to be subsidized for the care of its Medicare patients is only incidental to the purpose and design of the (Medicare) program.") (internal quotation marks and citations omitted).

[50] This assumes of course that Bayou Shores will be successful in regaining the provider agreements in the administrative appeals process. That in turn is a dubious proposition as an administrative law judge in that appeal has already granted summary judgment against Bayou Shores on the issue of the termination of the provider agreements. *See* Bankr. ECF No. 261-1, Administrative Law Judge Ruling on Motion for Partial Summary Judgement (Dec. 16, 2015).

conditions at Bayou Shores' facility, the bankruptcy court apparently decided that the three deficiencies Bayou Shores was cited for were not particularly serious. *Id.* at 163. The court also decided that Bayou Shores had corrected each of the deficiencies it was cited for and provided adequate assurances that it would be in compliance with the Medicare regulations in the future. *Id.* at 170-171. Notwithstanding HHS's determination to the contrary, the bankruptcy court deemed the health and safety of Bayou Shores' patients free of immediate jeopardy. The practical outcome of the bankruptcy court's decision was thus a reversal of HHS's decision: the bankruptcy court rolled back the termination, gave Bayou Shores back its provider agreements, and effectively prevented HHS from terminating Bayou Shores from the Medicare/Medicaid program for its repeated deficiencies. That was functionally a decision on the merits of the underlying HHS decision, and an interference with HHS's role in deciding who is eligible to participate in Medicare/Medicaid.[51]

The Government for its part disputes the bankruptcy court's version of the facts. With respect to the three violations, the picture painted by the Government suggests far more serious issues with the care provided by Bayou Shores to its

---

[51] We have explained previously that where both parties to a Medicare claim dispute "engage in extensive discovery and presentation of their whole cases on the merits, the district court does exactly what [HHS] is expected to do," and therefore "[i]t is simply not realistic to say that the district court in such a case does not address and decide the merits of the case." *V.N.A. of Greater Tift Cty., Inc. v. Heckler*, 711 F.2d 1020, 1032 (11th Cir. 1983). Such a merits-review is contrary to the policy embodied by the Medicare Act's limited judicial review provisions. *See id.*

54

patients. Federal Appellee Br. at 14-16; State Appellee's Br. at 3-4.[52]  Moreover,

the Government argues that simply coming back into compliance after each

violation was not the issue.  Rather, terminating repeat offenders like Bayou

Shores was a key part of Congress's overhaul of nursing home regulations, and

was intended to stop "instances in which substandard providers had avoided

termination from Medicare by claiming that they had cured serious violations of

safety standards, only to lapse back into noncompliance after the threat of

administrative sanction was removed."  Federal Appellee's Br. at 50-51.

In any event, we do not need to decide whose version of the facts is correct,

nor do we need decide whether the bankruptcy court's decision on the merits of

HHS's action was correct.  HHS, not the bankruptcy court, has been charged by

Congress with administering the Medicare Act and regulating Medicare providers.

Indeed, the bankruptcy court's action here stymied the direct statutory mandate

from Congress to HHS to take appropriate action (including potentially terminating

a provider agreement) when, as here, a survey determines that a nursing home's

condition "immediately jeopardize[s] the health or safety of its residents." *See* 42

---

[52] Most disturbingly perhaps, the bankruptcy court's opinion describes the result of the second incident somewhat innocuously: "[T]he patient with the history of abuse—who was in the facility for less than 24 hours—did not touch or otherwise harm the other resident." *In re Bayou Shores SNF*, 525 B.R. at 163.  But the Government contends that the "patient with the history of abuse" "sexually molest[ed]" his roommate during those 24 hours.  Federal Appellee Br. at 14-16; State Appellee's Br. at 3-4.  According to the underlying report, the roommate reported in an interview that the patient with the history of abuse "put his hand under the curtain and moved his hand on the sheet to about ¼ inch from my private parts." *See In re Bayou Shores*, Bankr. ECF No. 42-2 at 17.

U.S.C. § 1395i-3(h)(2).[53]  And though charged with broad jurisdiction to deal with issues related to a debtor's bankruptcy estate, bankruptcy courts generally lack the institutional competence or technical expertise of HHS to oversee the health and welfare of nursing home patients or to interpret and administer a "massive, complex health and safety program such as Medicare." *See Illinois Council*, 529 U.S. at 13.  Or at least, that is the judgment of Congress we derive from the enactment of § 405(h) in 1939 (and the recodification in 1984).

### 4.    § 405(h) clearly requires administrative exhaustion

Finally, while much of the above dispute concerns the third sentence of § 405(h) and whether it completely bars bankruptcy jurisdiction under § 1334, we do not overlook the effect of the first two sentences as well.  The bankruptcy court dismissed the second sentence as merely limiting "the ability of federal courts to review the findings of fact or an agency decision." *In re Bayou Shores SNF*, 525 B.R. at 167.  Though correct in a minimalist sense, we think that is an overly narrow understanding of the statute.  The Supreme Court made clear in *Salfi* that the first two sentences of § 405(h) "assure that administrative exhaustion will be required" and "prevent review of decisions of the Secretary save as provided in the

---

[53] If the deficiencies immediately jeopardize the health and safety of a facility's residents, "the Secretary *shall take immediate action* to remove the jeopardy and correct the deficiencies through the remedy specified in subparagraph (B)(iii), *or terminate the facility's participation under this subchapter* and may provide, in addition, for one or more of the other remedies described in subparagraph (B))." 42 U.S.C. § 1395i-3(h)(2) (emphasis added).

56

Act, which provision is made in § 405(g)." 422 U.S. at 757. The third sentence, according to the Court in *Salfi*, means that no action may be brought pursuant to any jurisdiction other than § 405(g), even where administrative remedies have been exhausted. *Id*.; *see also Illinois Council*, 529 U.S. at 13.

Bayou Shores does not dispute that its claims have not been administratively exhausted; in fact, as of the date of the oral argument, Bayou Shores' administrative appeal was still pending in front of an administrative law judge at HHS. *See* Oral Argument, March 29, 2016. Putting aside the jurisdictional question then, neither Bayou Shores nor the bankruptcy court has explained why standard principles of administrative exhaustion should not prevent a district court from hearing Bayou Shores' case. *See e.g. In re Rodriquez*, No. 09-93431-JB, 2010 WL 2035733, at *3-5 (Bankr. N.D. Ga. Mar. 23, 2010) (relying on § 405(g) and (h) to hold that bankruptcy court would not entertain non-administratively exhausted Social Security claims). Bayou Shores has also not shown that any exception to standard administrative exhaustion principles should apply here. *See McCarthy v. Madigan*, 503 U.S. 140, 146-149 (1992) (explaining the "three broad sets of circumstances" in which exceptions to administrative exhaustion may apply).

Thus, even if we were to assume that § 405(h) does not bar jurisdiction under § 1334, the bankruptcy court erred by not dismissing Bayou Shores' claim for failure to exhaust Bayou Shores' administrative remedies first.

## IV.    OTHER ARGUMENTS

Bayou Shores raises a number of other issues that it contends warrant reversal of the district court's Order. For the reasons below, we do not find these arguments persuasive.

### A.    Mootness

Bayou Shores argues that this dispute is either constitutionally moot or equitably moot. With respect to constitutional mootness, Bayou Shores contends that because the bankruptcy court's injunction and automatic stay have been dissolved, no live controversy between the parties remains. The Government contends that at least two live issues remain. First, the bankruptcy court's stay and injunction (even if now dissolved) prevented the Government from stopping payments to Bayou Shores during the pendency of the bankruptcy case. The Government argues that it intends to seek recoupment of these payments if the bankruptcy court's orders are found to be invalid. Second, contrary to Bayou Shores' contention that the injunction and stay have dissolved, the Government

58

contends that the bankruptcy court's Confirmation Order continues to indefinitely enjoin the Government from terminating the provider agreements.[54]

A case is constitutionally moot when "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Put another way, "[a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Florida Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1216-17 (11th Cir. 2000) (internal quotations and citations omitted).  Here, a holding that the bankruptcy court lacked subject matter jurisdiction would allow the Government to go forward with its efforts to terminate Bayou Shores from the Medicare/Medicaid program, as well as allow the Government to try and recover payments made to Bayou Shores since the filing of the bankruptcy court action.[55]  Meaningful relief is thus available, and this case is not constitutionally moot.

---

[54] For example, we note that the Confirmation Order contains the following: "Nothing set forth in the Amended Plan or this Order shall limit the power and authority of AHCA to take action related to the renewal or revocation of the Debtor's license necessary to protect public health, safety and welfare, ***provided however, that any such actions related to the renewal or revocation of the license may not be based upon the termination of the Medicare and Medicaid provider agreements that have been assumed by the Debtor***." *In re Bayou Shores*, Bankr. ECF No. 285 at 14. At oral argument, Bayou Shores conceded that this second issue was not constitutionally moot.

[55] Bayou Shores argues that the Government has no claim to damages because the Government "would be required to pay for the care of Bayou's patients, if not at Bayou, somewhere, because the vast majority of Bayou's patients are indigent." Appellant's Reply Br. at 28.  That argument misses the mark though.  The Government is not seeking to claw back the money merely to pocket the funds or to avoid paying for the care of Bayou Shores' patients.  Rather, the

Bayou Shores argues alternatively that the case is equitably moot because its Chapter 11 plan has been substantially consummated.  Equitable mootness is a discretionary doctrine that permits courts sitting in bankruptcy appeals to dismiss challenges (typically to confirmation plans) when effective relief would be impossible.  *See In re Nica Holdings, Inc.*, 810 F.3d 781, 786 (11th Cir. 2015). Central to a finding of mootness is a determination by an appellate court that it cannot grant effective judicial relief. *Id*. (quoting from *First Union Real Estate Equity & Mortg. Invs. v. Club Assocs. (In re Club Assocs.)*, 956 F.2d 1065, 1069 (11th Cir.1992)).  The equitable mootness doctrine seeks to avoid an appellate decision that "would knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." *Id.* at 787 (citing *Miami Ctr., Ltd. P'ship v. Bank of NY*, 838 F.2d 1547, 1555 (11th Cir.1988)).

Here however, we are reviewing whether the district court was correct in dismissing for lack of subject matter jurisdiction.  "Subject-matter jurisdiction properly comprehended … refers to a tribunal's power to hear a case, *a matter that can never be forfeited or waived.*"  *See Union Pac. R. Co. v. Bhd. of Locomotive*

---

Government (as required by statute) will not pay a facility such as Bayou Shores that fails to comply with health and safety regulations.  In other words, while the Government may be required to pay for the care of Bayou Shores' patients, it reasonably wants to pay someone other than Bayou Shores for that service.

*Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 81, 130 (2009) (internal quotation marks omitted; citations omitted; emphasis added). Because we agree with the district court that the bankruptcy court lacked subject matter jurisdiction over the assumption of Bayou Shores' provider agreements, that must end the inquiry.  When the lower court "lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit."  *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The Supreme Court in *Steel Co.* characterized this threshold inquiry as "inflexible and without exception." *See id.* at 94-95 (quoting from *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

Thus, even assuming for the sake of argument that Bayou Shores is correct that this situation justifies the application of equitable mootness, the absence of jurisdiction precludes the exercise of that discretionary authority.  Our only role

here is to correct the bankruptcy court's error by affirming the district court's

Order.[56]

B.    Bayou Shores' claims "arise" under the Medicare Act

Bayou Shores additionally argues that its claims do not "arise" under the

Medicare Act, and thus are not subject to the § 405(h) jurisdictional bar.

According to Bayou Shores, "[n]either the September 5 Order nor the

Confirmation Orders had anything to do with recovering a claim (a right to

payment) arising under the Medicare Act." Appellant's Br. at 58.

Bayou Shores' position however has already been rejected by the Supreme

Court. In *Illinois Council* the Court rejected the argument that claims "arising

under" the Medicare Act were limited to monetary claims:

> Nor can we accept a distinction that limits the scope of § 405(h) to
> claims for monetary benefits. Claims for money, claims for other
> benefits, *claims of program eligibility*, and *claims that contest a*

---

[56] Of course, we are addressing only the issue of the bankruptcy court's authority to adjudicate
Bayou Shores' claim to ownership of the provider agreements terminated by the Government. To
the extent Bayou Shores has other property in its bankruptcy estate, nothing in this opinion
addresses or reaches the bankruptcy court's actions with respect to that property.

Further, while we do not rule on the equitable mootness issue, we note that the limited factual
record in front of us suggests it would not be appropriate to do so in this situation.  Although the
Government did not obtain a stay, it appears from our review of the record that it was not for
lack of trying.  *See In re Nica Holdings*, 810 F.3d at 787 ("On this record, we cannot fault
[appellant] for not getting a stay.").  Moreover, the simplicity of the transactions and amounts of
money involved here appear more akin to the "simpler" transactions in *In re Nica Holdings*, 810
F.3d at 788 (no equitable mootness) than in the complex multi-million dollar transactions that
justified equitable mootness in *In re Club Assocs.*, 956 F.2d 1065 and *Miami Ctr., Ltd. P'ship v.
Bank of NY*, 820 F.2d 376 (11th Cir.1987).  Finally, the reliance interests of Bayou Shores'
creditors, who we must presume understood they were lending money to a nursing home that the
Government was attempting to shut down for violating health and safety regulations, also do not
weigh much in favor of applying equitable mootness.

*sanction or remedy* may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. *There is no reason to distinguish among them in terms of the language or in terms of the purposes of § 405(h)…* Nor for similar reasons can we here limit those provisions to claims that involve "amounts."

*Id.* at 14 (emphasis added).

Here, the determination of whether Bayou Shores is allowed to keep its provider agreements could be characterized as either a "claim[] of program eligibility" (*i.e.* whether Bayou Shore is eligible to participate in Medicare) or a "claim[] that contest[s] a sanction or remedy" (*i.e.* the sanction of terminating Bayou Shores from the Medicare program). In either case, the Supreme Court made clear in *Illinois Council* that Bayou Shores' claims fall within the ambit of § 405(h)'s "claim[s] arising under" the Medicare Act.

C.    Bayou Shores' Medicaid claims rise and fall with its Medicare claims

The parties also dispute whether the termination of Bayou Shores' Medicare provider agreement resulted in the termination of Bayou Shores' Medicaid provider agreement. In its briefing, Bayou Shores contends that AHCA failed to use the required procedures under Florida state law to terminate a Medicaid agreement. The Government argues that Medicaid agreements terminate by operation of law when Medicare agreements terminate. *See* 42 U.S.C. § 1396a(a)(39).

Without resolving this dispute, we note that the only issue necessary to decide is whether the bankruptcy court was barred by § 405(h) from taking jurisdiction over Bayou Shores' Medicaid provider agreements.  Courts have held that the Medicare and Medicaid statutory and regulatory provisions "provide that when a dually certified facility challenges a determination that it is not in substantial compliance with the common Medicaid and Medicare regulations and a termination of its participation in both programs, the facility must seek review of this determination through the Medicare administrative appeals procedure." *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 366 (6th Cir. 2000); *see also Michigan Ass'n of Homes & Servs. for Aging, Inc. v. Shalala*, 127 F.3d 496, 503 (6th Cir. 1997) ("The Medicaid Act's inclusion of § 405(g) is clear textual support for the proposition that Congress intended the exhaustion of administrative remedies to apply in cases [involving dual Medicare/Medicaid providers]); *Health Equity Res. Urbana, Inc. v. Sullivan*, 927 F.2d 963, 967 (7th Cir. 1991).

Bayou Shores cannot avoid the jurisdictional bar in § 405(h) by attempting to re-characterize its claim to the Medicaid provider agreement as separate from its claim to the Medicare provider agreement. *See Cathedral Rock*, 223 F.3d at 366-67.  Indeed, it can hardly be said that Bayou Shores has a separate Medicaid claim, notwithstanding the two separate provider agreements: the sole reason for termination of Bayou Shores' Medi*caid* provider agreement was the termination of

64

its Medi*care* provider agreement for Bayou Shores' failure to comply with

Medi*care* laws and regulations.  Allowing Bayou Shores to go forward with only

its Medicaid claims would thus put the bankruptcy court in the untenable position

of adjudicating a dispute fundamentally about Medicare laws and regulations (*i.e.*

whether Bayou Shores was in compliance with the relevant Medicare laws and

regulations), despite being barred from adjudicating Bayou Shores' Medicare

claims. *See Rhode Island Hosp. v. Califano*, 585 F.2d 1153, 1162 (1st Cir. 1978)

("Were we to assume § 1331 jurisdiction over the Hospital's Medicaid claim we

would find ourselves in the peculiar posture of hearing a case that consists entirely

of a challenge to the limits promulgated under [the Medicare Act], when we are

expressly barred by [the Medicare Act] from entertaining that challenge at this

time.").

Accordingly, Bayou Shores "cannot avoid the Medicare Act's administrative

channeling requirement simply because as a dual Medicare and Medicaid provider,

its claims also fall under Medicaid Act." *Cathedral Rock*, 223 F.3d at 367.[57]

D.　　Termination of the provider agreements

On appeal, the parties continue to dispute whether the provider agreements

in question terminated before or after the filing of Bayou Shores' bankruptcy

petition.  Because we have determined that the bankruptcy court lacked jurisdiction

---

[57] We do not need to decide here whether a different result would accrue in a case where a party presents only Medicaid claims to a bankruptcy court.

65

over the termination of the provider agreements, we decline to rule on the issue of whether or not the agreements terminated prior to the filing of the bankruptcy petition.

V.    Conclusion

We agree with the district court that the bankruptcy court erred as a matter of law when it exercised subject matter jurisdiction over the provider agreements in this case. The bankruptcy court was without § 1334 jurisdiction under the § 405(h) bar to issue orders enjoining the termination of the provider agreements and to further order the assumption of the provider agreements.

Thus, finding no reversible error in the district court's June 26, 2015, Order (*In re Bayou Shores*, 533 B.R. at 343) we AFFIRM.